IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

LISA RICKARD                          )
                                      )
v.                                    )      No. 1:09-0008
                                      )      Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION        )


To:    The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

supplemental security income ("SSI") benefits, as provided under Title XVI of the Social

Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on

the administrative record (Docket Entry No. 13), to which defendant has responded with its

own motion for judgment (Docket Entry No. 17). Plaintiff has also filed a response to

defendant's motion (Docket Entry No. 19). Upon consideration of these papers and the

transcript of the administrative record (Docket Entry No. 11),[1] and for the reasons given

below, the undersigned recommends that plaintiff's motion for judgment be GRANTED, that

defendant's motion for judgment be DENIED, and that the decision of the SSA be

REVERSED and the cause REMANDED for further administrative proceedings consistent

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

with this report.

# I. Introduction

Plaintiff filed her SSI application on May 25, 2004, alleging disability due to histoplasmosis, right ear deafness, osteoarthritis, bipolar disorder, and allergies. (Tr. 76-78, 88) Her application was denied at the initial levels of administrative review. (Tr. 44-47) She thereafter filed a request for de novo hearing before an Administrative Law Judge ("ALJ"). The hearing was held on May 31, 2007, and plaintiff appeared with a representative and gave testimony. Testimony was also received from plaintiff's mother and an impartial vocational expert. (Tr. 557-618) Following the hearing, the matter was taken under advisement until October 25, 2007, when the ALJ issued a written decision in which he concluded that plaintiff's impairments were not disabling. (Tr. 18-23) The decision contains the following enumerated findings:

1.  The claimant has never engaged in substantial gainful activity.

2.  The medical evidence shows that the claimant arguably has "severe" impairments, including arthritis of the left knee, decreased hearing, diabetes mellitus, allergies and residuals of histoplasmosis, and a bipolar disorder, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3.  The subjective complaints are not persuasive for the reasons given above.

4.  The claimant has the residual functional capacity to perform medium work with the limitations given above.

5.  The claimant has no past relevant work.

6.  The claimant was 48 years old at the application date, which is defined as a younger individual. She is currently 52 years of age, or closely approaching

2

advanced age.

7.  The claimant has a high school equivalent education.

8.  The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work.

9.  Based on an exertional capacity for medium work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rules 203.25 and 203.18, Table No. 3, or Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

10. Although the claimant's additional non-exertional limitations do not allow her to perform the full range of medium work, using the above-cited rules as a framework for decision-making and based on the vocational expert's testimony, there are a significant of jobs in the economy which she could perform. Examples and numbers of such jobs are cited above.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 22-23)

On December 22, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 5-7), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following factual summary is taken from defendant's brief (Docket Entry No. 18 at 3-9), with some modification by the undersigned.

3

<u>Mental Problems</u>

Plaintiff was treated by Dr. Hill at Centerstone Community Mental Health Care Center for her depression and bipolar disorder since at least 2002. She was assigned a GAF of 65 (mild symptoms) throughout her sessions and her mental status evaluations usually were within normal limits (Tr. 378-89, 392-437). She was last seen in May 2006 and terminated due to a lapse in service in October 2006 (Tr. 390-91).

On September 1, 2004, plaintiff underwent a consultative psychological examination by Mark Petro, Ph.D. (Tr. 268-74). Dr. Petro noted that "[t]he results of this examination are questionable due to this examiner's determination that malingering may be present" (Tr. 269). Plaintiff stated that she attended special education classes in school and obtained a GED, but Dr. Petro noted that the tests she completed indicated that she was in the borderline to low average range of intellectual functioning. (<u>Id.</u>) She reported that she was under treatment for a bipolar disorder and depression, and was prescribed Zoloft. She admitted thinking of suicide but had made no attempts. She denied any history of delusions. She admitted depressive symptoms of insomnia, fatigue, feelings of worthlessness, and recurrent thoughts of suicide, and panic attacks. Her activities of daily living included shopping for clothes and groceries, cooking once weekly, doing laundry, and cleaning the kitchen. Her recreational interests included watching television and playing with her son. Psychometric testing revealed a Verbal Comprehension Index score of 89. Subtest scores included reading at high school level, spelling at a sixth grade level, and arithmetic at a fifth grade level. No IQ scores were obtained due to plaintiff's chronic coughing. Dr. Petro gave a provisional diagnosis of bipolar disorder, not otherwise specified, and further diagnosed malingering (as a rule out diagnosis), reported hearing and financial difficulties, and assigned

4

a GAF of 51 (moderate symptoms). Dr. Petro opined that plaintiff's resulting functional limitations were in the range of mild to moderate, at worst. (Tr. 268-74)

On September 17, 2004, a nonexamining psychological consultant retained by the agency examined plaintiff's record, and made findings similar to those of Dr. Petro. (Tr. 283, 287).

<u>Physical Problems</u>

In 1999, plaintiff had been referred to an otolaryngologist, Dr. Kevin Lunde, for evaluation of hearing loss. Dr. Lunde's findings were significant for chronic middle ear infections and defects of both tympanic membranes. (Tr. 538-42) Dr. Lunde secured an audiogram to test plaintiff's hearing, with results showing mixed (conductive and sensorineural) hearing loss in the right ear that was "severe," and sensorineural hearing loss in the left ear that sloped from "moderate" at lower frequencies to "severe" at higher frequencies. (Tr. 543) He ordered a CT scan of plaintiff's temporal bones to evaluate her candidacy for ear surgery, which he felt was probably necessary. (Tr. 538, 540, 544) However, because of issues with plaintiff's health insurance, including the denial of coverage for the CT scan ordered by Dr. Lunde, he was to arrange for her to be transferred to another specialist. (Tr. 540) However, there is no further record of contemporaneous treatment by any specialist, nor any evidence that the possibility of ear surgery was pursued.

On December 13, 2004, plaintiff was seen at the Lewisburg Medical Clinic with complaints of congestion and left ear pain. A large amount of effusion (leaking fluid) from plaintiff's left tympanic membrane was noted, deafness was assessed, and plaintiff was

5

given a referral to Dr. Jeffrey Marvel, M.D. (Tr. 318) In late 2004-early 2005, plaintiff was treated by Dr. Marvel for infections of her middle ear, with serous otitis media on the left and chronic otitis media on the right. (Tr. 310-13) An audiogram ordered by Dr. Marvel revealed that plaintiff's hearing loss had worsened since 1999, with "profound" loss in the right ear and loss in the left ear that sloped from "moderate" to "profound." (Tr. 310) There is no record of plaintiff ever having obtained hearing aids (Tr. 310-12, 543-44, 574).

On September 7, 2004, plaintiff underwent a consultative physical examination by Dr. Darrel Rinehart, M.D. (Tr. 275-77). She complained of a bipolar disorder treated with Zoloft, histoplasmosis treated with antibiotics in the 1970s, shortness of breath, right ear deafness, and arthritis of her left knee. An August 2004 x-ray showed osteoarthritis in her left knee (Tr. 278). Dr. Rinehart noted that plaintiff "heard everything reasonably well at conversational tones" in the examination room (Tr. 276). Plaintiff weighed 240.5 pounds at a height of 66 inches. Examination revealed normal range of motion in all joints, although some swelling of the left knee with crepitus was noted. Straight leg raising was negative bilaterally. She was able to bend over and touch her toes. Dr. Rinehart opined that plaintiff should be able to sit, stand, and walk intermittently for 4-6 hours in an 8 hour workday (Tr. 277).

Plaintiff has a history of respiratory problems (shortness of breath and coughing) from histoplasmosis in the 1970s and allergies. However, her only treatment recorded was Benadryl, and according to her mother, she smoked two to three packs of

6

cigarettes daily (Tr. 573, 594-95).[2] She also was diagnosed with "borderline" diabetes in 2005, but apparently her physician made an error by reviewing another patient's lab reports and so she never received treatment (Tr. 577).

In October 2004, a nonexamining medical consultant evaluated plaintiff's record and assessed a residual functional capacity for medium work (Tr. 298-307).

Plaintiff received treatment from a nurse practitioner through the Lewisburg Medical Clinic through mid-2006 for complaints of flu, upper respiratory infections, allergic rhinitis, rash, yeast and urinary tract infections, cellulitis of the right eyelid, and abdominal pain (Tr. 437-511). A November 2005 colonoscopy was normal (Tr. 376). In December 2006, a family practitioner with the Lewisburg Medical Clinic, Dr. Charles Sidberry, M.D., completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), opining that plaintiff was unable to perform even the requirements of sedentary work (Tr. 439-42). However, the treatment notes from the Lewisburg Medical Clinic do not bear Dr. Sidberry's name, and she testified that this doctor never actually examined her (Tr. 565). Similarly, a note from Dr. Frank Faldo, M.D., of the Lewisburg Medical Clinic stating that plaintiff was "mentally unstable to seek employment" was also unaccompanied by any treatment notes from this doctor (Tr. 315).

In May 2007, Dr. Melvin G. Lewis, M.D., wrote a letter (Tr. 512), submitted at plaintiff's hearing, stating that plaintiff's diabetes and hyperlipidemia were complicated by

---

[2]At her hearing, plaintiff lied when she stated that she did not smoke at all (Tr. 585).

7

non-compliance in taking her medications and that knee osteoarthritis impaired her ability to walk even moderate distances.  Her mental illness (bipolar disorder and schizophrenia with hallucinations) caused her to believe she did not have diabetes or hyperlipidemia.  Due to her mental illness, she was unable to make proper decisions about her health or personal activities.  Dr. Lewis opined that due primarily to her mental impairment, plaintiff was unable to participate in gainful employment.  Plaintiff testified that she had seen this doctor on only three occasions (Tr. 566-67), and the treatment notes confirm those three visits, in addition to one visit subsequent to the date of Dr. Lewis's letter and the hearing in this case.  (Tr. 516-28).  Plaintiff also testified that Dr. Lewis did not treat her mental illness, only her physical problems (Tr. 577).

Non-Medical Evidence

At plaintiff's May 31, 2007 hearing, she testified that she was born on September 25, 1955 and was 51 years old (Tr. 559).  She completed the 11th grade in special education classes and obtained a GED (Tr. 560).  She claimed that she was unable to read or understand instructions or multiply or divide but could add and subtract and make change (Tr. 562).  Her only medications were Benadryl for allergies, over the counter (OTC) Aleve for pain, and OTC Immodium for irritable bowel syndrome (IBS) (Tr. 564, 569).  Her current physician, for the previous year, was Dr. Lewis (Tr. 565).  She stopped visiting Dr. Sidberry's office because the doctor "was never in the office" and she was seen only by a nurse practitioner (Tr. 565).  She testified that Dr. Lewis was treating her for arthritis, IBS, and

8

allergies (Tr. 565, 568).  She testified that her IBS required her to make sure she was always near a bathroom, but that Dr. Lewis had only recommended "natural" treatments and had not referred her to a specialist (Tr. 571-73).  She claimed that she was deaf in her right ear (Tr. 573).  Plaintiff testified that she was diagnosed with bipolar disorder and was "a little bit schizophrenic" but had not received any counseling or medication during the past year (Tr. 574-76).  She claimed that she was not diabetic, that Dr. Sidberry read a report belonging to another patient and made a mistake (Tr. 577-78).  She checked her blood glucose levels because her father was diabetic and her levels were normal at 104 mg (Tr. 578).  She complained of knee problems with pain and swelling, worse in the left knee (Tr. 579).  She used a cane but it had not been prescribed by any doctor.  Id.

She estimated that she could stand for 6 seconds and walk for 3 seconds, and she occasionally had problems sitting (Tr. 579-80).  Her activities included playing computer solitaire and working puzzles with her son (Tr. 581).  She claimed that she was unable to cook (Tr. 582).  She complained of a bad cough and allergies, but stated that she did not smoke (Tr. 584-85).  Plaintiff testified that she had a driver's license, but did not drive due to leg pain (Tr. 586).  She claimed to have difficulty lifting and estimated that she could lift 3 pounds (Tr. 586-87).  She helped clean the house and went to Walmart with her son (Tr. 588).

Plaintiff's mother also testified at the hearing.  She testified that plaintiff had lived with them since her son was born except for short periods when she was in "relationships" (Tr. 593).  She stayed in a separate cottage in the back yard.  She refused to

9

take her medications except Benadryl and had not continued treatment for her bipolar

disorder (Tr. 594). She only left the house to buy cigarettes, and contrary to plaintiff's

testimony, she smoked 2 or 3 packages daily (Tr. 595). Her mother stated that plaintiff

"hardly ever tells the truth" (Tr. 596).


### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that

agency's findings of fact are supported by substantial evidence in the record and whether the

correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d

124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir.

1994)). Even if the evidence could also support a different conclusion, the SSA's decision

must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc.

Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits

by proving his or her "inability to engage in any substantial gainful activity by reason of any

10

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must

"result[] from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at §

423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step

sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r

of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by

relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the

11

claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in failing to evaluate properly plaintiff's hearing loss at both the third and fifth steps of the sequential evaluation process; in failing to consider properly the effects of plaintiff's obesity; in adopting the assessment of the

12

nonexamining DDS physician over the opinions of sources who treated and/or examined

plaintiff; and, in failing to give proper weight to the full testimony of plaintiff's mother.

While plaintiff's latter three arguments are not persuasive, the undersigned finds error in the

ALJ's determination regarding the vocational impact of plaintiff's hearing loss, in light of the

objective medical evidence and the vocational expert testimony in this case. Consequently,

the government has failed to carry its burden at step five of the sequential evaluation

process, and remand for further development is in order.

As to the alleged error at step three, Plaintiff argues not that she meets the

criteria of the listing for hearing impairments, but that her hearing loss in combination with

her other impairments equals the criteria of the listing. Under section 2.08 of the Listing of

Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, disability is presumed at the third step of

the sequential evaluation process upon proof of the following criteria or their medical

equivalents:

> *Hearing impairments* (hearing not restorable by a hearing aid)
> manifested by:
> A. Average hearing threshold sensitivity for air conduction of 90
> decibels or greater and for bone conduction to corresponding maximal levels,
> in the better ear, determined by the simple average of hearing threshold levels
> at 500, 1000 and 2000 hz. (see 2.00B); or
> B. Speech discrimination scores of 40 percent or less in the better ear[.]

Again, plaintiff concedes that her hearing loss does not meet all of the above criteria;

although she appears to be essentially deaf in her right ear, the test results on her "better,"

left ear do not correspond with the above criteria. However, plaintiff argues that her impairment is close to meeting the criteria, "so that when combined with her other impairments, it could equal the listing." (Docket Entry No. 14 at 9) Unfortunately, the equivalence determination does not work that way. Like the determination of whether an impairment meets the requirements of a listing, the equivalence determination must account for all the criteria of the listing, to ascertain whether each medical finding described therein which is absent from the claimant's medical records is fairly represented by a comparable, documented finding of equal medical severity. See Sullivan v. Zebley, 493 U.S. 521, 531 (1990). Thus, it would not be proper to weigh the effects of other, unrelated impairments in considering whether a *nearly* listing-level impairment equals the listed criteria. Id. at 531-32 & nn. 10, 11.

However, at the fourth and fifth steps of the sequential evaluation process, the impact of plaintiff's hearing loss was not properly considered. As plaintiff points out, the objective medical evidence includes audiogram results revealing profound mixed (sensorineural and conductive) hearing loss in her right ear, and moderate to profound sensorineural hearing loss in her left ear (Tr. 310, 543), in addition to defects of her eardrums and problems arising from fluid accumulation and chronic infections in the middle ear. (Tr. 308-12, 538-44) When asked whether she had hearing aids, plaintiff merely testified that she could not afford them (Tr. 574). However, it is not clear from the record that hearing aids were in fact ever prescribed. The treatment notes from Drs. Marvel and Lunde do not

14

appear to include any reference to or prescription for hearing aids, though they do refer to plaintiff's possible need for ear surgery (Tr. 538-40). On the other hand, plaintiff's brother indicated in a written statement to the agency that she had been prescribed hearing aids, but would not wear them. (Tr. 114) In any event, it is clear that plaintiff's hearing loss is a severe impairment, as determined by the ALJ (Tr. 19, 22), with potential vocational consequences.

Unfortunately, the ALJ did not explicitly account for this hearing loss in determining plaintiff's residual functional capacity. (Tr. 21) Rather, he adopted the nonexamining state agency consultant's opinion that plaintiff was exertionally limited to medium work, without mentioning that the consultant had found plaintiff's hearing impairment to be nonsevere.[3] However, the ALJ concluded his narrative opinion by citing vocational expert testimony "that with the hearing loss described at the hearing, the number and jobs named would not be adversely affected." (Tr. 22) At the hearing, the ALJ had addressed plaintiff's hearing loss in the following colloquy with the vocational expert:

> Q:     All right. If an individual experiences difficulty due to hearing loss in receiving oral communication, particularly in a noisy environment, would that have any significant impact on the jobs you've identified?
>
> A:     Your Honor, I could not respond to that question without seeing an audiogram that was done by a competent audiologist. In most cases, it would not. The

---

[3]The nonexamining consultant's finding of nonseverity was based on the earlier report of the consultative examiner that plaintiff heard conversational tones reasonably well in the examination room. (Tr. 21, 276, 300, 306)

Case 1:09-cv-00008   Document 20   Filed 11/12/09   Page 15 of 22 PageID #: 93

jobs that I have identified here, for the most part, don't involve communication, except with a supervisor or coworkers, possibly.

Q:      Right.

A:      If we use the level of hearing demonstrated during testimony, there would be, in my opinion, no significant effect, and I've spent several years working with deaf and hearing-impaired adults in rehabilitation.

(Tr. 608)   The upshot of the ALJ's consideration of plaintiff's hearing loss, then, appears to be that, on the basis of reasonably good, unaided hearing of conversational tones in the quiet of an examination room and an administrative hearing room,[4] plaintiff was determined to have either no pertinent limitations on work-related functioning, or limitations that are not severe enough to compromise the availability of the jobs identified by the vocational expert.

Neither of these determinations are adequately explained or substantially supported by the evidence of record.  The objective medical evidence of plaintiff's severe hearing impairment should have resulted in either the inclusion of some communicative limitation in the ALJ's finding of her RFC, or an explicit finding that such limitations were not assigned because of her refusal to follow prescribed treatment.  Instead, the ALJ attempted to split the difference:  his observation that plaintiff "has never gotten recommended hearing aides" (Tr. 19) alludes to recalcitrance on her part, yet he proceeds to rely on "proof" that her unaided hearing is sufficient to perform the jobs identified by the

_____

[4]Plaintiff points out that she frequently had to ask the ALJ to repeat his questions to her during the hearing.

vocational expert. However, in giving the above-quoted testimony, the expert essentially

opined that the hypothetical "difficulty due to hearing loss in receiving oral communication,

particularly in a noisy environment" would significantly impact the numbers and types of

jobs he had identified only if the hearing loss (and resulting difficulty receiving oral

communication) were bad enough; he then relied on his own judgment of the extent of her

hearing loss to dismiss any such significant impact. In relying upon this testimony, the ALJ

improperly utilized the expert outside of his area of expertise. See, e.g., Webb v. Comm'r of

Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004) (finding any requirement that vocational experts

evaluate the effects of medical conditions to be inconsistent with the purpose such experts

serve under the regulations, and outside their area of expertise). Plainly, if the expert had

been passed the audiogram results on record here, and had opined that plaintiff's

performance at the hearing belied the severe deficits recorded by two different audiologists,

such unqualified testimony would be unworthy of credence. Id. The undersigned finds no

significant difference between that scenario, and the ALJ's reliance here on expert testimony

that is founded on the lay observation of plaintiff's ability to receive oral communication in

an otherwise quiet hearing room. Cf. Cramer v. Astrue, 2009 WL 2927286, at *8 (E.D. Tenn.

Sept. 3, 2009) (finding error because "[t]he ALJ did not tell the VE what level of hearing

impairment he found from all of the evidence he found credible, including the audiological

findings in the record. Rather, he invited the VE to draw his own conclusion based solely on

the testimony of Plaintiff..."). Inasmuch as plaintiff's hearing impairment was not adequately

considered in the step five analysis of the availability of other work to someone with plaintiff's RFC, the government has failed to carry its burden at that step, and the decision denying benefits is undermined.

Plaintiff further argues, albeit with a single sentence (Docket Entry No. 14 at 10), that the ALJ erred in failing to ensure that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). The government did not respond to this argument. Social Security Ruling ("SSR") 00-4p imposes an "affirmative responsibility" upon ALJs who receive vocational expert testimony as to the requirements of a job, "to ask about any possible conflict between that [testimony] and information provided in the DOT." 2000 WL 1898704, at *4. Accord Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 606 (6th Cir. 2009). The ALJ here failed to carry out this affirmative responsibility. Courts have held such a failure to be subject to harmless error review, particularly in cases where no particular inconsistency between the expert's testimony and the DOT has been identified. Fleeks v. Comm'r of Soc. Sec., 2009 WL 2143768, at *6-7 (E.D. Mich. July 13, 2009) (citing cases). In the instant case, plaintiff has made a bare, nonspecific allegation that "the VE's testimony regarding his own observation [of plaintiff's ability to hear] does not comply with the DOT[.]" (Docket Entry No. 14 at 10) While the undersigned would otherwise be hard-pressed to find reversible error from this allegation, it is noteworthy that the expert's testimony to the existence of available jobs identified those jobs by their "standard occupational code" number, not a DOT code. (Tr. 607-08) The codes invoked by

18

the expert appear to correlate with the Standard Occupational Classification ("SOC") system, a system incorporated by the Occupational Information Network ("O*NET") which superceded the DOT as the federal government's primary source of occupational information in 1999.[5]  Although considered obsolete by most other federal agencies, the DOT continues to be used extensively by the Social Security Administration, although plans to replace the DOT as the Administration's primary vocational reference source are underway.  See 73 Fed. Reg. 78864 (Dec. 23, 2008).  In the meantime, however, SSR 00-4p continues to require consistency between vocational expert testimony and the DOT.  The expert's citation in this case to SOC codes begs the question of inconsistency with the DOT, see Eaton v. Barnhart, 2005 WL 1168460 (D. Me. Mar. 14, 2005) (finding expert's citation of census codes to be insufficient under SSR 00-4p) (citing Anschutz v. Barnhart, 212 F.Supp.2d 1077, 1085 (S.D. Iowa 2002) (same)), and the undersigned would direct that the matter be clarified on remand.

As to the remaining errors alleged here, it is acknowledged in plaintiff's brief that she "was less than truthful during her testimony, thereby destroying her credibility." (Docket Entry No. 14 at 13)  She further acknowledges that the record contains no proof that she was ever examined by her purported treating physician, Dr. Sidberry.  Id.  Indeed, she testified that she only saw a nurse practitioner at Dr. Sidberry's office, and never Dr.

---

[5]See http://www.doleta.gov/programs/onet and http://www.onetcenter.org/overview.html.

19

Sidberry himself. (Tr. 565) Citing this reason for discounting Dr. Sidberry's December 2006 assessment, the ALJ plainly complied with the regulatory requirement of giving good reasons to explain the weight given that assessment. As recognized by the ALJ, the evidence of both plaintiff's physical and psychological impairments is rife with inconsistency, and in the undersigned's view, the ALJ properly executed his duty to resolve the inconsistencies on both of these fronts. Furthermore, the ALJ properly demonstrated his consideration of plaintiff's mother's testimony (Tr. 21), apparently deciding that her testimony that plaintiff was nonfunctional and prone to telling lies due to mental instability did not compare favorably with the records of plaintiff's mental health care at Centerstone, which "show a stable mental health condition and no more than mild symptoms from 2002 until she stopped treatment in 2006." (Tr. 22) Such matters are within the province of the ALJ, and within the zone of choice presupposed by the nature of substantial evidence review; as such, this court may not properly second-guess these determinations. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

Finally, while plaintiff alleges error in the ALJ's failure to consider her obesity and the effect it has on her residual functional capacity, citing SSR 02-1p, it does not appear from the medical record that plaintiff was ever diagnosed with obesity by any of her physicians, nor provided significant medical advice or treatment concerning weight loss. While the nonexamining DDS physician diagnosed obesity based on plaintiff's recorded height and weight, and identified it as a severe impairment (Tr. 298-300), SSR 02-1p specifies

20

that obesity is not typically considered to be a medically determinable impairment unless it is diagnosed by a physician who has examined the claimant, or unless the record supports the judgment that it should be considered as such. 2000 WL 628049, at *3. The ruling goes on to say that obesity is only considered in the determination of residual functional capacity if it is identified as a medically determinable impairment. Id. at *7. The medical record in this case simply does not compel the conclusion that plaintiff suffers from the medically determinable impairment of obesity, despite her body weight. Therefore, the ALJ's failure to discuss the issue was not erroneous.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, that defendant's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt

of this Report and Recommendation can constitute a waiver of further appeal of this

Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909,

912 (6th Cir. 2004)(en banc).

      **ENTERED** this 12th day of November, 2009.


           s/ John S. Bryant
           JOHN S. BRYANT
           UNITED STATES MAGISTRATE JUDGE